* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stanback. Based upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence affirms with minor modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as a matter of law the following, which were entered by the parties at the hearing as:
 STIPULATIONS
1. At all relevant times hereto, the parties were bound by and subject to the provisions of the North Carolina Workers' Compensation Act, the defendant-employer regularly employing three or more employees.
2. On May 5, 2001, an employer-employee relationship existed between the plaintiff-employee and defendant-employer.
3. As of May 5, 2001, the carrier on the risk was CNA Claims Plus.
4. The plaintiff-employee's average weekly wage on May 5, 2001, including any overtime and allowances was $765.99, which produces a compensation rate of $510.68.
5. By Industrial Commission Form 60 filed on or about November 2, 2001, the defendants admitted the plaintiff-employee's right to receive compensation for an injury by accident suffered on May 5, 2001.
6. Defendants have paid the plaintiff-employee weekly disability benefits commensurate with her compensation rate for all periods that she has been out of work since October 8, 2001, and continuing.
7. Since September 24, 2003, plaintiff-employee has been receiving $914.00 monthly in Social Security disability benefits.
 * * * * * * * * * * *
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, the plaintiff was a 49 year old high school graduate with technical college training as a clerk and typist. Her prior work experience includes employment in various fields including work as a material board handler, bartender and waitress, car washer, delivery package sorter, and fast food restaurant clerk. For the ten-year period of 1991 through 2001, plaintiff often worked between two and three jobs at a given time, and her Social Security Earnings Report for that same time frame shows earnings of approximately $26,000.00 per year.
2. Prior to plaintiff's employment with the defendant-employer, plaintiff was employed from 1991 through 1998 primarily as a full-time package sorter for the United States Postal Service (USPS). Her position involved working with heavy parcel post, which required her to separate packages and lift large mailbags.
3. During the time she was employed by USPS, plaintiff sustained an injury to her low back, after which she was out of work for more than one year. In October 1997, she filed a claim with the USPS Office of Workers Compensation Program reporting that she had injured her low back at work in September 1996 while reaching and pulling mail down from a top tier sorter. A subsequent investigation into the matter revealed that in September 1996, plaintiff reported to her supervisors that she had in fact injured her back while moving some furniture in one of her many rental homes. Plaintiff acknowledged her false report and her claim for benefits was denied. Upon further inquiry, she was removed from her position with USPS in June 1998 for misrepresenting material facts in relation to her workers' compensation claim.
4. During the hearing, plaintiff was less than forthright regarding the circumstances of her dismissal from USPS. She testified that she left her position when "I got injured at work and I was out of work so long from getting medical treatment." When asked whether she filed a workers' compensation claim, plaintiff testified that she had not.
5. Following the September 1996 incident, plaintiff received treatment for her low back through Forsyth Medical Center, which continued through at least October 1997. This was not the first instance in which plaintiff sought medical treatment for her low back. In 1984, she reported the onset of low back pain to her family physician such that she was unable to go to work. When her symptoms persisted despite local and conservative treatment, the physician referred her to an orthopedist for further evaluation and treatment. In 1986, she treated with her family physician for approximately eight weeks in which she reported pain in her lower quadrant radiating into the back and into her lower extremities.
6. Plaintiff underwent a lumbar MRI on October 10, 1996, the results of which returned normal, and when she continued to complain of pain in her low back and pelvis, along with bilateral leg pain, she was referred to a neurologist for further evaluation and treatment. The neurological evaluation did not show any definitive evidence of lumbosacral disc disease, and she underwent an exploratory laparoscopy on June 4, 1997. Thereafter, plaintiff continued to report pain in her low back, and another lumbar MRI, taken October 15, 1997, showed smooth disc margins, regular vertebral body signals, and was otherwise normal. Based on her continued reports of low back pain, the treating physician referred her to a pain management clinic where she received a series of lumbar steroid injections, the last of which was administered on May 18, 1998. Throughout this time, plaintiff remained out of work.
7. After her dismissal from USPS, plaintiff began working as an unarmed security guard for the defendant-employer, and she was assigned initially to work as a patrol officer at Baptist Hospital in Winston-Salem. She worked in this position for approximately one year, at which point she was transferred to a third-shift position as a patrol officer at an American Express facility in Greensboro. In general, her job consisted of walking through the facility securing doors, checking in visitors, and patrolling an outside parking lot. She also assisted American Express security personnel in investigating minor incidents, and, if necessary, she responded to medical emergencies. Following a brief period of time, she was promoted to "site supervisor," a position which included added job responsibilities of employee supervision and scheduling, and reporting payroll hours to the home office.
8. On May 5, 2001, plaintiff was on security patrol in the American Express building and, as she walked through the kitchen area, she slipped and fell onto the floor twisting her low back, sustaining an admittedly compensable injury by accident arising out of and in the course of her employment with the defendant-employer. As she was falling, she reached out and grabbed a food cart, somewhat breaking her fall. Following the incident, she walked downstairs and informed another security guard about the incident. At the time she did not believe that she sustained a significant injury, and she continued working and did not seek medical treatment.
9. Plaintiff worked her next shift, and on May 7, 2001, she reported the onset of pain in her low back, at which point she was sent by defendants for a medical evaluation at Concentra Medical Center. She was seen by occupational physician Dr. Sonya Buchanan and reported low back pain with bilateral leg pain. Dr. Buchanan specializes in occupational medicine and is not board-certified. X-rays taken of plaintiff's lumbar spine showed no evidence of any bony abnormalities, and following a physical examination, Dr. Buchanan diagnosed a lumbar strain. Dr. Buchanan recommended conservative treatment through physical therapy and prescription medications, and she placed plaintiff on modified work restrictions of no repetitive lifting over 20 pounds, no bending greater than two times per hour, and no squatting and/or kneeling. Plaintiff's position with the defendant-employer was within these restrictions, and she continued working full time.
10. Plaintiff returned to Dr. Buchanan on May 8, 2001, reporting the onset of neck pain and stiffness, as well as continued low back pain. Cervical x-ray results returned normal, and Dr. Buchanan added a diagnosis of a cervical strain that she treated through an intramuscular injection. No modifications were made to plaintiff's work restrictions, and she continued working full time.
11. Following the intramuscular injection, plaintiff's neck condition resolved, but she continued to report pain in her low back, which she treated through physical therapy and follow-up visits with Dr. Buchanan. When her symptoms persisted into June 2001, Dr. Buchanan ordered a lumbar MRI (taken on June 13, 2001), the results of which were normal, showing no evidence of degenerative disc disease.
12. Based on the negative MRI results, and plaintiff's continued reports of low back pain, Dr. Buchanan recommended an orthopedic evaluation which was performed by Dr. Albert Bartko on June 29, 2001. Dr. Bartko is board-certified in physical medicine and rehabilitation. During the initial visit, plaintiff presented with complaints of low back pain extending into the buttocks, and following a physical examination, Dr. Bartko confirmed Dr. Buchanan's diagnosis of low back pain. Dr. Bartko could not establish any structural diagnosis for plaintiff's low back problems due to the fact that there were no objective findings in his physician examination or the diagnostic studies that would support plaintiff's subjective pain complaints. Dr. Bartko noted that plaintiff exhibited positive Waddell's signs (signs of symptom magnification) during his examination. Dr. Bartko did not assume plaintiff's care, but he recommended that she consider a trial TENS unit and that she undergo a Functional Capacity Evaluation.
13. In July 2001, the defendant-employer's contract with American Express ended, and plaintiff transferred to a position performing night security at a Home Depot construction site in Winston-Salem. Similar to her position at American Express, plaintiff's new position required no lifting and the only stooping or bending that was involved was getting into and out of her patrol vehicle. She was not required to apprehend criminal suspects, and her main responsibility was access control by contacting the local police if any unauthorized individuals entered the construction site.
14. Following Dr. Bartko's orthopedic evaluation, plaintiff continued working full time, and she returned to Dr. Buchanan on July 20, 2001, reporting no improvement in her symptoms. At that point, Dr. Buchanan determined that plaintiff's condition had reached a plateau because there was no change in her subjective complaints along with no objective evidence to support plaintiff's complaints of low back pain. She then referred plaintiff for a Functional Capacity Evaluation.
15. Prior to performing the Funtional Capacity Evaluation, plaintiff was seen by orthopedic surgeon, Dr. Peter Dalldorf, on August 1, 2001. During a physical examination, she reported to Dr. Dalldorf that she was continuing to work in her security guard position, but that she was having some difficulty with her back while sitting. Dr. Dalldorf reviewed plaintiff's diagnostic studies, and he agreed with Dr. Buchanan's and Dr. Bartko's recommendation that plaintiff should perform a Functional Capacity Evaluation in order to properly determine her functional abilities and identify any potential weakness in her back. Dr. Dalldorf's assessment was a lumbosacral contusion or deep bruise to the back.
16. Plaintiff performed the Functional Capacity Evaluation on August 21, 2001, but the test results were considered to be invalid due to significant symptom exaggeration on the part of plaintiff. The examiner noted, however, that plaintiff's low back area was functioning as well as her non-injured areas, and that she was physically capable of working in her security guard position. Dr. Dalldorf reviewed plaintiff's performance of the Functional Capacity Evaluation, and based on the test results, as well as his prior examination of plaintiff, he opined that she gave "a very poor effort" such that she was "exaggerating her disability." He reviewed his findings with plaintiff on August 29, 2001, at which time he determined that she had reached maximum medical improvement regarding any injury she sustained to her low back on May 5, 2001. Dr. Dalldorf further noted that he could not find any physical or radiographic problems with her back and, therefore, he assigned a zero percent permanent partial impairment rating to plaintiff's low back.
17. Throughout August and September 2001, plaintiff continued working full time in her security guard position for the defendant-employer. Her supervisor, James Welch, observed her work performance on a number of occasions and noted that plaintiff did not appear to be having any difficulty performing her work. On one occasion, he traveled out to the Home Depot construction site where he observed plaintiff for approximately ten minutes bending and twisting over the back seat while cleaning out the back seat of her patrol car. On that occasion, plaintiff asked for something to drink so that she could take some pain medication.
18. During September 2001, plaintiff did not seek any further medical treatment for her low back from Dr. Buchanan, Dr. Bartko or Dr. Dalldorf.
19. The Full Commission specifically finds that by August 29, 2001, plaintiff had reached maximum medical improvement from any injury she sustained on May 5, 2001, and that at that time she was fully capable of earning wages equal to or greater than what she was earning prior to May 5, 2001.
20. On October 6, 2001, plaintiff sought treatment at the emergency department of Baptist Hospital in Winston-Salem where the attending physician diagnosed an "exacerbation" of chronic back pain; however, the evidence is not clear as to whether this exacerbation was related to her work duties in any way. The physician recommended that plaintiff be seen by a neurologist, and plaintiff was removed from work pending this evaluation. In the interim, plaintiff returned to Dr. Buchanan on October 10, 2001, and similar to the previous physical examinations, Dr. Buchanan recorded that plaintiff's subjective complaints were inconsistent with the objective findings.
21. Plaintiff underwent an EMG/Nerve conduction study at Baptist Hospital on November 29, 2001, the result of which showed normal muscle strength in her upper and lower extremities and no evidence of peripheral polyneuropathy or lumbar-sacral radiculopathy. The next day she underwent a neurological evaluation performed by Dr. Edward Hill, a neurologist with a doctorate in neuroanthropology, during which she reported tenderness in the base of the neck as well as discomfort in the low back. Dr. Hill recorded a "nonfocal neurological examination," but due to plaintiff's "strong complaints of pain" he observed that her condition may have an arthritic component and suggested that she undergo a rheumatologic evaluation. During Dr. Hill's deposition testimony, Dr. Hill could not state to a reasonable degree of medical certainty that plaintiff's eventually diagnosed fibromyalgia was related to her originally compensable work injury of May 5, 2001. Also, Dr. Hill was not tendered as an expert witness during his deposition or at any other time.
22. Plaintiff received an evaluation from rheumatologist, Dr. Paul Sutej, on January 10, 2002, following which Dr. Sutej diagnosed her as suffering from fibromyalgia. Dr. Sutej is an associate professor at Wake Forest Baptist Medical Center and is board-certified in internal medicine and rheumatology. Dr. Sutej described fibromyalgia as "a very difficult concept for people to understand" but essentially it is a term which is ascribed to "unexplained body pain." He did indicate, however, that in his visits with patients with this condition, he seeks to "devictimize" patients and to reassure them that they are not crazy or hyprochondriacs, because the pain the patient suffers is real. He further opined that plaintiff's physical examination revealed tenderness in different parts of the body that was compatible with a diagnosis of fibromyalgia, and he recommended that she consider conservative treatment options such as lifestyle modifications, stress management and exercise, rather than pharmacological treatment. Dr. Sutej only saw the plaintiff on one occasion, but he never sees someone with fibromyalgia back in his office, unless he has doubts about the diagnosis. He did not indicate to plaintiff that her condition was related to the May 5, 2001, incident, and in fact, he later opined that he could not state with any degree of medical certainty what caused her to develop the condition.
23. Following the rheumatologic evaluation, plaintiff remained out of work and she continued to receive treatment through the Downtown Health Plaza in Winston-Salem, primarily through prescription narcotics. In September 2002, she received another evaluation from Dr. Laura Black of the Hunter Hopkins Center in Charlotte, in relation to an application for Social Security Disability benefits. Dr. Black is board-certified in family practice with a specialty in chronic fatigue syndrome and fibromyalgia. She had been practicing in this field for three years at the time of deposition in September 2004. Following a two-day evaluation, Dr. Black confirmed Dr. Sutej's diagnosis of fibromyalgia, and made additional diagnoses of chronic fatigue syndrome, irritable bowel syndrome, and acid reflux. Dr. Black, however, has not given an opinion regarding whether any of these conditions resulted from the May 5, 2001, incident. In any event, plaintiff did not provide Dr. Black with complete details regarding her prior medical history, nor was Dr. Black provided with complete information regarding the treatment and recommendations given by Dr. Bartko and Dr. Dalldorf. Ultimately, Dr. Black indicated that plaintiff was limited to performing any activity for more than four or five minutes that would cause her to achieve a heart rate of more than 100, as this may cause a relapse in symptoms.
24. Plaintiff was re-evaluated by Dr. Bartko on September 9, 2002, at which time she reported an increase in intensity of her symptoms, with generalized aches and pains, which was more diffuse. During the examination, plaintiff was tender to the touch in certain areas but also exhibited positive Waddell's signs. Dr. Bartko diagnosed "perceived" chronic diffuse pain but did not identify the same with fibromyalgia. Dr. Bartko recommended plaintiff return to work at sedentary duty with a ten-pound lifting restriction with no repetitive bending, lifting or twisting. Dr. Bartko also indicated that the restriction "grossly underestimates [plaintiff's] true work abilities," as the only basis for the restriction was plaintiff's subjective reports of pain. Dr. Bartko further recommended that plaintiff return to work with her job at U.S. Securities.
25. Since October 6, 2001, plaintiff has remained out of work and in the year prior to the hearing she had been treating her fibromyalgia through prescription narcotics. Prior to the date of the hearing, the last medical treatment she received was a pain medication renewal at the Downtown Health Plaza in April 2003.
26. Through an Industrial Commission Form 60 defendants accepted as compensable plaintiff's claim for benefits arising out of the injury she sustained to her low back on May 5, 2001, and plaintiff has been provided temporary total disability benefits for all times that she has been out of work since October 6, 2001; however, the plaintiff's inability to earn wages after October 6, 2001, was not related to injuries she sustained in her originally compensable injury by accident of May 5, 2001. The greater weight of the evidence fails to establish that the onset of plaintiff's fibromyalgia or the disability she suffered as a result thereof was caused by the May 5, 2001, incident or any other injury she sustained during her employment with the defendant-employer.
27. The greater weight of the evidence establishes that the plaintiff is capable of returning to work at a sedentary level. There is insufficient evidence to suggest that plaintiff is permanently and totally disabled. Even the vocational assessment performed by Goodwill Industries indicated that with proper pain control of her symptoms, plaintiff could return to work in a clerical or office setting or perhaps a light industrial job.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On May 5, 2001, plaintiff sustained an admittedly compensable injury by accident to her low back arising out and in the course and scope of her employment with the defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff is entitled to medical treatment for her low back at defendants' expense that is reasonably designed to lessen the period of disability, or that will affect a cure or provide her with relief from the injury sustained on May 5, 2001. N.C. Gen. Stat. § 97-25. "Logically implicit" in this requirement is that the medical treatment be "directly related to the original compensable injury." Weaver v. Swedish ImportsMaintenance, Inc., 319 N.C. 243, 253, 354 S.E.2d 477, 483 (1987); Pittmanv. Thomas Howard, 122 N.C. App. 124, 130, 468 S.E.2d 283, 286,disc. rev. denied, 343 N.C. 513, 472 S.E.2d 18 (1996). Defendants have provided plaintiff with reasonable medical treatment for the injuries she sustained in the May 5, 2001, incident including treatment through Dr. Buchanan, Dr. Bartko and Dr. Dalldorf and on August 29, 2001, she reached maximum medical improvement from any injury she sustained in the May 5, 2001 incident.
3. Plaintiff bears the burden of establishing the causal link between the work-related injury and the medical treatment sought. See Parsons v.Pantry, Inc., 126 N.C. App. 540, 485 S.E.2d 867 (1997), citing Snead v.Sandhurst Mills, Inc., 8 N.C. App. 447, 451, 174 S.E.2d 699, 702
(1970). Plaintiff in this matter has failed to establish the existence of a causal relationship between the onset of her fibromyalgia, first diagnosed on January 10, 2002, and the injury by accident which occurred on May 5, 2001, and therefore she is not entitled to have defendants pay for any medical treatment related to this condition.
4. Plaintiff likewise bears the initial burden of establishing the existence of her disability as well as its extent. Effingham v. TheKroger Company, 149 N.C. App. 105, 111, 561 S.E.2d 287, 292 (2003). Our appellate courts have routinely noted that to support a conclusion of disability the plaintiff must prove the following three elements: (1) an incapacity after the injury of earning the same wages earned prior to the injury in the same employment; (2) an incapacity of earning the same wages earned prior to the injury in any other employment; and (3) that the incapacity to earn wages was caused by a compensable injury. SeeHilliard v. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982); Daltonv. Anvil Knitwear, 119 N.C. App. 275, 458 S.E.2d 251 (1987); and Russellv. Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454
(1993). If the plaintiff fails to make an evidentiary showing of one of the three Hilliard elements, an ongoing claim for disability benefits must be denied. See e.g. Parker v. Wal-Mart Stores, Inc.,156 N.C. App. 209, 212, 576 S.E.2d 112, 114 (2003).
Our Supreme Court has also held that "where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." Click v. Freight Carriers, 300 N.C. 164, 167,265 S.E.2d 389, 391 (1980). The requisite degree of proof is by the "greater weight" or "preponderance" of the evidence, and any causative expert opinion regarding the third Hilliard element must rise above the level of mere speculation or conjecture. Holley v. ACTS, Inc., 357 N.C. 228,581 S.E.2d 750 (2003); Young v. Hickory Bus. Furn., 353 N.C. 227, 230,538 S.E.2d 912, 915 (2000); Ballenger v. ITT Grinnell Indus. Piping,Inc., 320 N.C. 155, 357 S.E.2d 683 (1987).
None of the six medical providers who have testified in this matter have rendered an opinion that plaintiff's disabling fibromyalgia is causally related to the low back injury she sustained on May 5, 2001, or the plaintiff's employment with the employer. Accordingly, plaintiff has not established a causal link between a compensable injury and her incapacity to earn wages beginning on October 6, 2001, as required by our Supreme Court's holding in Hilliard, and therefore, plaintiff is not entitled to further workers' compensation benefits after October 6, 2001.
5. Plaintiff has failed to establish by the greater weight of the evidence that as a result of her admittedly compensable injury by accident of May 5, 2001, she is permanently and totally disabled, and plaintiff has further failed to prove that she has sustained any permanent partial disability with regards to her admittedly compensable injury by accident of May 5, 2001. N.C. Gen. Stat. §§ 97-29, 97-31.
 * * * * * * * * * * *
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Plaintiff's request for additional medical treatment is DENIED.
2. Defendants are entitled to terminate payment of ongoing temporary total disability benefits effective as of the date of the entry of this Opinion and Award. Defendants are also entitled to a credit for all temporary total disability payments made to plaintiff from October 6, 2001, to the date of this Opinion and Award.
3. Each side shall bear one-half of the costs.
This the __ day of January 2005.
 S/_________________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/_________________ BUCK LATTIMORE CHAIRMAN
 S/_________________ THOMAS J. BOLCH COMMISSIONER